## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

TERRY SORENSEN,

    Plaintiff,

v.

JERRY ROARK, Warden Bent County
MAUREEN SHERIDAN,
ROBERT SHEPARD,
DONNY BRITTON,
DONALD TRUJILLO,
MARK FAIRBAIRN, Warden Arkansas Valley,
SHANE COREY,
OMAR MENDOZA
In their individual and official capacities as employees of the Colorado Department of Corrections

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Terry Sorensen, by and through undersigned attorneys, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

This case involves a pattern of repeated failures of DOC staff members to protect Plaintiff from known threats of violence. As a result of DOC's deliberate indifference, Plaintiff was assaulted on multiple occasions and suffered severe injuries, including having his jaw broken for the second time in less than two years.

### JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over Plaintiff's claims for attorney fees and costs pursuant to 42 U.S.C. § 1988.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). All events alleged in this Complaint occurred within the State of Colorado.

## PARTIES

3. At all times relevant to this suit, Plaintiff Terry Sorensen ("Plaintiff") was a citizen and resident of the State of Colorado.

4. At all times relevant to this suit, Defendant Jerry Roark ("Defendant Roark") was employed by the Colorado Department of Corrections ("DOC") and was Warden at Bent County Correctional Facility.

5. At all times relevant to this suit, Defendant Maureen Sheridan ("Defendant Sheridan") was employed by DOC and was employed in DOC's Office of Inspector General ("OIG").

6. At all times relevant to this suit, Defendant Robert Shepard ("Defendant Shepard") was employed by DOC.

7. At all times relevant to this suit, Defendant Donny Britton ("Defendant Britton") was employed by DOC.

8. At all times relevant to this suit, Defendant Donald Trujillo ("Defendant Trujillo") was employed by DOC.

9. At all times relevant to this suit, Defendant Mark Faribairn ("Defendant Fairbarn") was employed by DOC and was Warden at Arkansas Valley Correctional Facility.

10. At all times relevant to this suit, Defendant Shane Corey ("Defendant Corey") was employed by DOC and was employed in DOC's OIG.

11. At all times relevant to this suit, Defendant Omar Mendoza ("Defendant Mendoza") was employed by DOC and was a boot sergeant.

12. On information and belief, at all times relevant to this suit, Defendants were citizens and residents of the State of Colorado. At the time of the events forming the basis of this suit, Defendants were acting within the scope of his employment and under the color of state law in his capacity as an employee of the Colorado Department of Corrections.

## GENERAL ALLEGATIONS

13. Plaintiff's claims stem from his time as an inmate with the Colorado Department of Corrections ("DOC").

14. Plaintiff's history in DOC shows a history of being the subject of violent threats and assaults, and DOC officials ignoring these threats of violence directed at Plaintiff.

15. In January 2020, Plaintiff was sent to Buena Vista Correctional facility.

16. Upon arriving at Buena Vista, Plaintiff asked to speak to Intel because he feared for his life.  Plaintiff told DOC officials that he was not safe.

17. Plaintiff was assaulted by a blindside attack by Derek Dewitt, with a hit to the temple.

18. Plaintiff was sent to the emergency room in Salida, Colorado, where he required stitches between his eyes.

19. Following about a week in the hole, Plaintiff was sent to Bent County Correctional Facility, in February 2020.

20. At Bent County, Plaintiff was placed in a cell with Michael Graham.

21. Mr. Graham was being extorted by the Bloods gang to make alcohol in the cell.

22. Mr. Graham was caught by prison officials.

23. As a result of prison officials' investigation, Plaintiff was sent to the hole.  Plaintiff cooperated with the prison officials' investigation.

24. Plaintiff told prison officials that Mr. Graham was being extorted by the Bloods gang.

25. A few days after Plaintiff was released from the hole, he was served a disposition from prison officials that plainly stated that Plaintiff had said his cellmate was being extorted.

26. Plaintiff was served this disposition in plain view of other inmates, including members of the Bloods gang.

27. Other inmates knew that Plaintiff's reference to his cellmate being extorted referred to the Bloods gang.

28. DOC officials' decision to serve Plaintiff this disposition in a manner that allowed other inmates, including members of the Bloods gang, to see the content of the disposition that indicated Plaintiff cooperated with the investigation into his cellmates' making of alcohol and specifically informed prison officials of the Bloods gang's involvement, directly placed Plaintiff in danger of retaliation.

29. Plaintiff informed the unit office and Unit Manager Salazar that the disposition was seen by members of the Bloods gang and that he was therefore in danger, feared for his life, and could not safely go back to his unit.

30. Plaintiff returned to his unit and just a few days later and was assaulted by a member of the Bloods gang. Plaintiff was kicked and hit in his face, suffering injuries to his nasal cavity and a fractured jaw.

31. Plaintiff was not provided medical attention for three days.

32. Plaintiff required extensive medical attention in the infirmary.

33. While receiving medical attention, Defendant Sheridan came to talk to Plaintiff. Plaintiff informed Defendant Sheridan that members of the Bloods gang kicked his face at Bent County. Plaintiff pleaded with Defendant Sheridan to place him somewhere safe and not return him to Bent County.

34. Despite knowing that Plaintiff, previously attacked by a member of the Bloods gang, would not be safe at Bent County, Defendant Sheridan took no steps to prevent Plaintiff's return to Bent County.

35. While receiving medical attention, Defendant Shepard came to talk to Plaintiff. Plaintiff informed Defendant Shepard that members of the Bloods gang kicked his face at Bent County. Plaintiff pleaded with Defendant Shepard to place him somewhere safe and not return him to Bent County.

36. Despite knowing that Plaintiff, previously attacked by a member of the Bloods gang, would not be safe at Bent County, Defendant Shepard took no steps to prevent Plaintiff's return to Bent County.

37. In June 2020, Plaintiff was sent back to Bent County.

38. When Plaintiff got back to Bent County, Plaintiff talked with Defendant Britton. Plaintiff explained to Defendant Britton that members of the Bloods gang had previously attempted to kill him at Bent County and that he was in danger at the facility.

39. Despite knowing that Plaintiff, previously attacked by a member of the Bloods gang would not be safe at Bent County, Defendant Britton took no steps to prevent an assault on Plaintiff at Bent County or to move Plaintiff to a different facility. In fact, Defendant Britton knowingly commanded Plaintiff to return to the unit.

40. Defendant Trujillo saw Plaintiff at Bent County and was surprised that Plaintiff was placed at that facility because of Plaintiff's history with Bloods gang members and the threat they posed to Plaintiff and Plaintiff's previous assault.

41. Despite knowing that Plaintiff, previously attacked by a member of the Bloods gang would not be safe at Bent County, Defendant Trujillo took no steps to prevent an assault on Plaintiff at Bent County or to move Plaintiff to a different facility.

42. On information and belief, as warden of Bent County, Defendant Roark knew or had reason to know that Plaintiff faced a substantial risk of physical assault at Bent County and took no steps to prevent an assault on Plaintiff at Bent County or to move Plaintiff to a different facility.

43. On September 12, 2020, inmate Matthew Graves, assaulted and stabbed Plaintiff in Plaintiff's cell.

44. Mr. Graves approached Plaintiff at a workout station, calling Plaintiff out. Plaintiff walked away from Mr. Graves and heads to his cell.

45. Mr. Graves followed Plaintiff to his cell.  Plaintiff put his arm up to block Mr. Graves' way into Plaintiff's cell.  Mr. Graves forced his way into Plaintiff's cell and began to assault Plaintiff.

46. Mr. Graves punched Plaintiff, striking Plaintiff in the eye, and below cheek.

47. Plaintiff tried to keep Mr. Graves at a distance, using his hand.  When Mr. Graves complained that Plaintiff was choking him, Plaintiff removed his hand.

48. Mr. Graves then rushed at Plaintiff and stabbed Plaintiff in the leg with a pen, drawing blood.

49. As a result of Mr. Graves's assault, Plaintiff suffered physical injuries.

50.  Despite Mr. Graves being the aggressor and assaulting Plaintiff without provocation, Plaintiff was written up for the incident.  Furthermore, despite Mr. Graves stabbing Plaintiff in the leg and drawing blood, documentation of Plaintiff's injuries do not reflect all of Plaintiff's injuries, including the injury to his leg.

51. Following Plaintiff's assault by Mr. Graves, in January 2021, Plaintiff was sent to protective custody at Buena Vista.

52. Conditions at Buena Vista were bad, and Plaintiff was placed in a tier surrounded by Bloods gang members.

53. In June 2021, Plaintiff witnessed an inmate assaulted in protective custody by members of the Bloods gang.  The inmate was rendered unconscious for over 30 minutes.

54. Plaintiff became involved in the investigation into the assault and cooperated with prison officials.  Plaintiff agreed to be a witness and testify about the assault he witnessed committed by Bloods gang members.

55. Members of the Bloods gang knew that Plaintiff was cooperating with the investigation into the assault and threatened Plaintiff with physical violence.

56. Because of his cooperation with prison officials in their investigation into the assault and the threats to his physical safety, Plaintiff was moved to protective custody at Arkansas Valley Correctional Facility.

57. At Arkansas Valley, protective custody is one of two pods in Unit 6, and inmates are not locked down all day.

58. Plaintiff was placed in a pod in with members of the Bloods gang.

59. After Plaintiff arrived at Arkansas Valley, letters began arriving blaming Plaintiff for his cooperation with prison officials' investigation into the assault.

60. Plaintiff received threats of physical violence from other inmates, including members of the Bloods gang, and members of the 211 gang. Plaintiff was harassed, threatened with physical violence, and Plaintiff's life was threatened.

61. Plaintiff could not walk in the pod without being harassed.

62. Plaintiff began visiting seeing a mental health professional employed by DOC. Plaintiff told her on multiple occasions that he was being harassed and threatened by other inmates and asked her for help. She arranged a meeting between him and Defendant Corey.

63. Plaintiff informed Defendant Corey about his problems in the pod.

64. Plaintiff informed Defendant Corey that other inmates, including members of the Bloods and 211 gangs, were threatening him as a result of his cooperation with DOC and law enforcement regarding the assault of an inmate at Buena Vista. Plaintiff asked Defendant Corey for help on more than one occasion.

65. Despite this knowledge, Defendant Corey took no steps to prevent an assault on Plaintiff, protect Plaintiff from violence, or move Plaintiff to a different facility.

66. Plaintiff was kept in the same pod at Arkansas Valley.

67. In September 2021, Plaintiff was assaulted by inmate Tommy Hollowman.

68. Mr. Hollowman first confronted Plaintiff in a common area.

69. Defendant Mendoza, boot sergeant at the time, witnessed Mr. Hollowman, a member of the 211 gang, confront Plaintiff, and went to view the encounter on security monitors.

70. After the confrontation with Mr. Hollowman, Mr. Hollowman's friend, an inmate with the last name Ramos, followed Plaintiff to his cell.

71. Defendant Mendoza witnesses Ramos follow Plaintiff to his cell and told Ramos to get and don't come back.

72. On information and belief, Defendant Mendoza knew that other inmates, including members of the Bloods and 211 gangs, threatened Plaintiff's life because of Plaintiff's participation and cooperation with the investigation into the assault at Buena Vista.

73. Despite witnessing this confrontation with Mr. Hollowman and having knowledge of the threats to Plaintiff, Defendant Mendoza took no steps to prevent an assault on Plaintiff, protect Plaintiff from Mr. Hollowman, or move Plaintiff to another facility. Defendant Mendoza left for his shift change and put off looking into moving Plaintiff for the next day.

74. Following the shift change, Ramos came back to Plaintiff's cell and began assaulting him. Ramos's friends came and took him out.

75. As Plaintiff watched Ramos's friends telling Ramos he was wrong to assault Plaintiff, Mr. Hollowman came up behind Plaintiff and punched Plaintiff from behind.

76. Mr. Hollowman punched Plaintiff twice.

77. Mr. Hollowman's assault fractured Plaintiff's jaw in two places – a break on the left side and a break on the right side just below the hinge.

78. Plaintiff went back to his cell after the assault, and staff came to his room to take him to medical.

79. Plaintiff waited in the hole for three hours before being taken to the emergency room in Pueblo.

80. Plaintiff was given a shot for the pain.

81. Following his emergency room visit, Plaintiff sat in the hole for three to four days while only given Ibuprofen and/or Tylenol for pain.

82. Plaintiff was then taken to the dentist and has his jaw wired shut again.

83. Plaintiff was in the infirmary for eight weeks following his assault.

84. Despite Plaintiff's assault and the known threats from other inmates, DOC officials sent Plaintiff back to protective custody at Arkansas Valley.

85. While in the infirmary, Plaintiff was told that he would not be receiving a write-up for the incident.

86. Despite Plaintiff being threatened by inmates and Mr. Hollowman punching Plaintiff from behind without provocation, Plaintiff was written up for the incident.

87. On information and belief, as warden of Arkansas Valley, Defendant Fairbairn knew or had reason to know that Plaintiff faced a substantial risk of physical assault at Arkansaas

Valley and took no steps to prevent an assault on Plaintiff at Arkansas Valley or to move Plaintiff to a different facility.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 8th Amendment*
Failure to Protect (September 2020 Assault) – Against Defendants Roark, Sheridan, Shepard, Britton, and Trujillo

88. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

89. At all relevant times hereto, the Defendants were acting under the color of state law in their capacities as DOC employees.

90. Defendants are "persons" under 42 U.S.C. § 1983.

91. In light of the facts known to the Defendants, each knew that Plaintiff faced a substantial risk of serious harm and each disregarded that risk by failing to take reasonable measures to abate it.

92. At the time of the events alleged herein, the law was clearly established that a prison official violates the Eighth Amendment to the United States Constitution when he or she knows or has reason to know that an inmate faces a substantial risk of serious harm and fails to take reasonable measures to abate the risk. *Farmer v. Brennan*, 511 U.S. 825 (1994).

93. Defendants' failure to protect Plaintiff caused Plaintiff damages. Plaintiff suffered severe physical and psychological injuries past, present, and future.

94. Defendants' actions were motivated by malice and/or involved reckless or callous indifference to Plaintiff's federal protected rights, and they engaged in these actions and

11

omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

95. Defendants' acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including his physical and mental pain and anguish.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 8th Amendment*
Failure to Protect (September 2021 Assault) – Against Defendants Fairbairn, Corey, and Mendoza

96. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

97. At all relevant times hereto, the Defendants were acting under the color of state law in their capacities as DOC employees.

98. Defendants are "persons" under 42 U.S.C. § 1983.

99. In light of the facts known to the Defendants, each knew that Plaintiff faced a substantial risk of serious harm and each disregarded that risk by failing to take reasonable measures to abate it.

100. At the time of the events alleged herein, the law was clearly established that a prison official violates the Eighth Amendment to the United States Constitution when he or she knows or has reason to know that an inmate faces a substantial risk of serious harm and fails to take reasonable measures to abate the risk. *Farmer v. Brennan*, 511 U.S. 825 (1994).

101. Defendants' failure to protect Plaintiff caused Plaintiff damages. Plaintiff suffered severe physical and psychological injuries past, present, and future.

102. Defendants' actions were motivated by malice and/or involved reckless or callous indifference to Plaintiff's federal protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

103. Defendants' acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including his physical and mental pain and anguish.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to this following:

a. Injunctive relief, including requiring Defendants to take adequate measures to ensure Plaintiff's safety from physical assault, including moving Plaintiff to a different facility if necessary;

b. Actual economic damages as established at trial;

c. Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

d. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

  f. Attorney's fees and costs; and

  g. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: September 8, 2022

                Respectfully submitted,

                <u>*/s/ Igor Raykin*</u>
                Igor Raykin
                Michael Nolt
                Kishinevsky & Raykin, LLC
                2851 South Parker Road, Suite 150
                Aurora, CO 80014
                Tel: (720) 748-8888
                Fax: (720) 748-8894
                igor@coloradolawteam.com
                michael@coloradolawteam.com
                ***Attorneys for Plaintiff***